IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Personal Restraint of | ) | No.  38585-0-III |
| | ) | |
| | ) | |
| | ) | |
| JOSE MANUEL QUINTERO, | ) | PUBLISHED OPINION |
| | ) | |
| | ) | |
| Petitioner. | ) | |

LAWRENCE-BERREY, J. — In this timely personal restraint petition (PRP), Jose Quintero raises five grounds for relief and raises an additional claim in his conclusion. In his second supplemental brief, he raises two new untimely claims and asserts a cumulative error argument for the first time. We decline to consider his two new untimely claims, but conclude that his cumulative error argument, premised on arguments raised in his timely petition, is not a new claim, and consider it.

Mr. Quintero's most noteworthy claim is that two nonconstitutional rulings were erroneous and violated his right to a fair trial, and his petition should be granted under the less strenuous "constitutional error" standard. We agree that the trial court's two rulings were erroneous and potentially highly prejudicial. We nevertheless determine that the errors, singularly or cumulatively, were nonconstitutional.

No. 38585-0-III
*In re Pers. Restraint of Quintero*

Washington courts have yet to describe what type of nonconstitutional errors warrant collateral relief. We adopt the habeas corpus standard: The erroneous admission of prejudicial evidence will not justify collateral relief unless the evidence had a substantial and injurious effect on the jury's decision. In assessing this, we consider the importance of the wrongly admitted evidence and the overall strength of the State's case. The importance of wrongly admitted evidence is determined by the prosecutor's conduct with respect to the evidence, whether the evidence bore on an issue plainly critical to the jury's decision, and whether it was material to the establishment of a critical fact or whether it was instead corroborated and cumulative. The strength of the prosecution's case, absent erroneously admitted evidence, is probably the single most critical factor.

We conclude that the two nonconstitutional errors do not meet this standard for granting relief and deny Mr. Quintero's petition.

FACTS

In 2014 and 2015, Janette Rojas Balderas (Ms. Rojas) worked as a confidential informant for the Walla Walla Police Department. Ms. Rojas had agreed to help law enforcement conduct controlled buys of narcotics in exchange for leniency on her pending criminal charges. Throughout her time working as an informant, Ms. Rojas completed 15 controlled buys for law enforcement.

2

In one of the controlled buys, Ms. Rojas purchased methamphetamine from Charley Lozano (Mr. Lozano). Law enforcement then charged Mr. Lozano with delivery of methamphetamine based on Ms. Rojas's controlled buy. Mr. Lozano eventually pleaded guilty and was scheduled to be sentenced on August 10, 2015. Through the discovery process in that case, Mr. Lozano learned Ms. Rojas's identity as the informant.

Ms. Rojas told police she heard the 18th Street Gang, a criminal street gang, had "green-lighted" her, meaning the gang identified her as a target because she was an informant for law enforcement. Rep. of Proc. (RP) at 963. Witnesses stated Mr. Lozano, a member of the 18th Street Gang, wanted Ms. Rojas dead. Jose Quintero was also a member of the 18th Street Gang.

Two days before Mr. Lozano's sentencing, on August 8, 2015, there was a going away party for Mr. Lozano. At around midnight that evening, Ms. Rojas and her boyfriend, Jon Cano, were sitting outside their home when they were each shot multiple times. Ms. Rojas was shot 11 times and Mr. Cano was shot 5 times. Both died. The shootings occurred on East Walnut Street in Walla Walla, Washington. There were no eyewitnesses.

In October 2015, Mr. Quintero was being held on $100,000 bail in the Walla Walla County jail on unrelated charges. During that time, he wrote two different rap

lyrics that glorified gang lifestyle, including shooting "'snitches.'" PRP, App. H. At the time, his cellmate, Birzavit Carmona Hernandez, had been arrested for a shooting at the Green Lantern Tavern and his bail was $500,000. Mr. Carmona Hernandez gave Mr. Quintero's rap lyrics to police.

In April 2016, seven months after the Walnut Street murders, the State charged Mr. Quintero with two counts of murder in the first degree while armed with a firearm and one count of unlawful possession of a firearm in the first degree.

*Pretrial*

In his report, the lead detective in the case noted: "The rap lyrics are about the 18th Street gang's lifestyle to include: partying, rivalries, shootings, killing 'snitches', and 18th Street gang members being locked up for crimes. I did not note anything specific about this homicide on either of the rap lyrics." PRP, App. H.

In a motion in limine, Mr. Quintero sought to exclude evidence of the rap lyrics he had written. His counsel argued:

> Facially, the lyrics describe certain gang-related values and activities, but do not provide any details of the homicides that are the subject of this case. Indeed, the State's lead gang detective, upon reviewing the lyrics, concluded in his report that they did not contain anything of evidentiary value.
>    The lyrics are substantially more prejudicial than probative. They do not tend to make any fact at issue in the case more or less probable, and do not provide any information about the shootings of Janette Rojas and Jon

Cano. However, they tend to have a prejudicial effect by inviting inferences about Mr. Quintero's character and propensities, by suggesting that he romanticizes gang relationships and activities. Because the prejudicial effect substantially outweighs any probative value of the lyrics, they should be excluded under ER 401, 402, and 403.

. . . .

. . . The lyrics are fictional forms of artistic expression that do not set forth the nexus between the contents of the lyrics and the facts of the charged crime. They serve merely as a "dog whistle" to the prejudices of the jury and to depict [Mr. Quintero] as the kind of person who would commit the crime at issue. Such evidence is highly inflammatory and should not be admitted.

Clerk's Papers (CP) at 49-50.

The State argued the lyrics were admissible to show Mr. Quintero's "association with the 18th Street Gang, to show his knowledge of gang activities, and to show motive." CP at 108-09. It contended Mr. Quintero's lyrics were admissible under ER 404(b) because they showed his support for murdering "ratas" or "snitches," which directly related to Mr. Quintero's motive in the case. CP at 109. The State also argued that the bail amount listed in the lyrics, $500,000, was identical to the bail set for Mr. Quintero.[1]

---

[1] As noted earlier, when Mr. Quintero composed the lyrics, his bail was $100,000 on unrelated charges. His bail was not set at $500,000 until later, after the State charged him in this matter.

The trial court granted Mr. Quintero's motion in limine in part. It ordered: "The Court will allow a redacted portion of the lyrics that allegedly describes the charged crime and related circumstances, such as the bail imposed upon defendant." CP at 189. The lyrics were redacted for trial.

In another motion in limine, Mr. Quintero's defense counsel sought to prevent the State from calling Jose Lozano, Mr. Lozano's brother, who was the alleged driver on the night of the shootings.[2] The State had named Jose Lozano as a potential witness and the defense anticipated he might not cooperate if called to the stand. Originally, Jose Lozano was a codefendant, charged with first degree murder, but the cases were severed before Mr. Quintero's trial.

The State argued Jose Lozano could no longer claim a Fifth Amendment to the United States Constitution right because he had already pleaded guilty. Jose Lozano had pleaded guilty to a substantially reduced charge in exchange for a sentencing recommendation of two years.

The defense responded that if Jose Lozano refused to testify and the court held him in contempt and it all happened in the presence of the jury, this would be highly

---

[2] To distinguish between the brothers, we refer to the driver by his full name, while we continue to refer to the shooter as Mr. Lozano.

6

inflammatory and prejudicial. Defense counsel warned if this happened during trial, she might move for a mistrial because it would invite adverse inferences to be drawn by the jury, which would be impermissible. Following oral argument on the motion in limine, the court reserved ruling on the matter for trial, stating: "If you think you have a hostile and/or uncooperative witness we do not want to create a scene in front of the jury. I understand [defense counsel's] concern in that regard." RP at 178.

In yet another motion in limine, the defense sought to limit the State's ballistics evidence that the shell casing marks "matched" or were fired from the same firearm. CP at 39. The defense requested that any testimony purporting to establish a match should be qualified by informing the jury of the error rate and that "the certainty of such conclusions should be allowed to be stated only on a 'more likely than not' basis." CP at 44. To support the argument, the defense had hired Dr. Raymond Grimsbo. It was Dr. Grimsbo's opinion that "reliable sources . . . critique the shortcomings and unscientific assumptions of current ballistics analysis methodologies, including the methodology employed by the Washington State Patrol Crime Lab in the present case." PRP, App. G at 2-3.

The trial court denied Mr. Quintero's request to limit the State's ballistic evidence. The court instructed counsel that the ballistics witnesses "shall" not testify that their methods or conclusions are certain.  CP at 189.

*Trial*

The case proceeded to a jury trial.  The State introduced approximately 160 exhibits and called 23 witnesses.  Three of Mr. Quintero's fellow gang members—Birzavit Carmona Hernandez, Diego Bante Rivera, and Jose Lozano—testified for the State.  Their testimonies are particularly relevant.

*Birzavit Carmona Hernandez*

Mr. Carmona Hernandez testified he was in jail in October 2015 because he had been charged with murder in the first degree and assault in the first degree.  The charges stemmed from the shooting at the Green Lantern Tavern in Walla Walla of two people, one of whom was a fellow 18th Street Gang member who had testified against another member.  Mr. Carmona Hernandez denied he was the shooter.

He told the jury that he and Mr. Quintero shared a cell in October 2015 and, during this time, Mr. Quintero talked about the Walnut Street murders.  According to Mr. Carmona Hernandez, Mr. Quintero admitted that he and Mr. Lozano killed Ms. Rojas and Mr. Cano.  Mr. Quintero told him that Jose Lozano drove and parked two houses away

8

from Ms. Rojas's house, and that he and Mr. Lozano walked up and shot Ms. Rojas and Mr. Cano. Mr. Quintero told him that he and Mr. Lozano used "a 9 and a 25," which referenced handguns. RP at 653. Mr. Carmona Hernandez testified that he knew Mr. Quintero carried a .9 millimeter handgun.

Mr. Quintero told him the vehicle Jose Lozano was driving that night was a van belonging to the Lozano brothers' mother. Mr. Quintero said that most of his shots hit Ms. Rojas. Mr. Quintero told Mr. Carmona Hernandez that he shot Ms. Rojas and Mr. Cano because Ms. Rojas had testified against Mr. Lozano. Mr. Quintero said he could see Ms. Rojas's body moving with the impact of the bullets hitting her. Mr. Carmona Hernandez then testified Mr. Quintero had given him rap lyrics that Mr. Quintero had written while they were in jail together.

In the middle of Mr. Carmona Hernandez's testimony, the parties, outside the jury's presence, discussed the admission of the rap lyrics. Both sides debated what portions of the lyrics, if any, related to the charged crimes. Mr. Quintero argued that the lyrics had to do mostly with the Green Lantern shooting. Over his objection, the following portions of the lyrics were admitted as exhibits:

G-CODE
CASES GOING COLD NO MATTER HOW MUCH DEDICATION
THIS AINT BRAGGIN
SHOUT OUT TO THE HOMIES DOING TIME IN [CLALLUM] BAY
AND ONE EIGHT SEVEN GREEN LIGHT TO ALL THEM KNOWN
RATAS
THEY HIT EM WITH THE 500,000 ON THE BAIL
SO AINT NO OUT OF JAIL YET THE HOMIES KEEP IT QUIET
MURDER IN THE FIRST DEGREE IS WHAT THE PAPERS SAID

Suppl. Br. of Pet'r (filed Dec. 5, 2022) (First Supp.), App. A (Ex. 41 admitted at trial).

AINT NO PEACE TREATY
WHAT MUST IT TAKE FOR A RAT TO STOP TALKIN
TAKE CARE OF IT YOURSELF AND YOU BETTER GETS TO
WALKIN
YOU GET THE COLD METAL AND YOU POINT IT AT THEIR DOME
LET THEM KNOW THEY DEAD AND PUT SOME LEAD UP IN THE
HEAD
THE MUZZLE KEEPS FLASHIN IT KEEPS THE BODY SHAKING
BALASO FOR BALASO ALL THE BULLET IT BE TAKIN

First Supp., App. B (Ex. 42 admitted at trial).

Mr. Carmona Hernandez provided the following testimony about the lyrics:

> [PROSECUTOR:] . . . "and 187 green light." Do you know what that means?
> [MR. CARMONA HERNANDEZ:] Yes.
> [PROSECUTOR:] And how do you know what it means?
> [MR. CARMONA HERNANDEZ:] It's like a code for dead.
> [PROSECUTOR:] What does it mean? Code for what?
> [MR. CARMONA HERNANDEZ:] Death.
> . . . .
> [PROSECUTOR:] And what does ratas mean or rata?
> [MR. CARMONA HERNANDEZ:] Rats, snitches.

> . . . .
> [PROSECUTOR:] . . . What does in the third line, it says you can, "you get the cold metal," what does "cold metal" mean? Do you know what that means?
> [MR. CARMONA HERNANDEZ:] A gun.
> . . . .
> [PROSECUTOR:] . . . "at their dome." Do you know what that means "at their dome"?
> [MR. CARMONA HERNANDEZ:] In their head.
> . . . .
> [PROSECUTOR:] Okay. Why did you give these lyrics to the police?
> [MR. CARMONA HERNANDEZ:] Because it kind of talks like what he had done.
> [PROSECUTOR:] Okay. And when, in speaking with Jose Quintero while you were in jail with him, did he ever make reference to Janette Rojas about whether or not she was a snitch or a rata?
> [MR. CARMONA HERNANDEZ:] Yes.
> [PROSECUTOR:] What did he say about that?
> [MR. CARMONA HERNANDEZ:] That she was a snitch.

RP at 682-84.

On cross-examination, Mr. Carmona Hernandez said he agreed to testify against certain individuals, including Mr. Quintero, in exchange for a reduction in his first degree murder and first degree assault charges to criminal mischief and fourth degree assault. He stated the reduction in his charges was important because he did not want to be deported. He admitted that when he was arrested for the Green Lantern shootings, his bail was $500,000. He further admitted, at the time his bail was set, Mr. Quintero had not yet been charged with murder.

11

On redirect, the prosecutor asked Mr. Carmona Hernandez, "so these lyrics, as pointed out, in talking about the $500,000 bail, could have been talking in part about you and your co-defendants?" RP at 709. Mr. Carmona Hernandez responded, "[c]ould have, yeah." RP at 709.

*Diego Bante Rivera*

Mr. Bante Rivera shared the same cell in October 2015 with Mr. Quintero and Mr. Carmona Hernandez while in the Walla Walla County jail. He was also a member of the 18th Street Gang. He testified about statements made by Mr. Quintero while both were in the same cell.

Mr. Quintero told him "they" were driving around and had passed by Ms. Rojas and her boyfriend sitting outside her home. RP at 1127. Mr. Quintero said he and Mr. Lozano got out of the van, walked up to Ms. Rojas, and shot her and her boyfriend. Mr. Quintero said he had used a .9 millimeter gun and Mr. Lozano had used a .25 caliber gun. He said the two were killed because Ms. Rojas was a snitch and killing snitches is "[j]ust part of the gang code." RP at 1131.

Mr. Bante Rivera explained why he came forward and spoke to police. In July 2016, several months after the Walnut Street murders, fellow gang members wrongly thought he snitched so they shot him 13 times, which left him paralyzed from the chest

12

down.  He realized the gang was not loyal to him, so he decided to tell police what he

knew about the Walnut Street murders.

*Jose Lozano*

Prior to Jose Lozano testifying, Mr. Quintero revisited his motion in limine related

to his testimony:

> [DEFENSE COUNSEL]:  . . . [Jose] Lozano was the subject of a
> Motion in Limine No. 7, which was reserved until trial under the Court's
> order.
>
> . . . .
>
> . . . I would note, for the record, that counsel for Mr. Lozano, Mr.
> Olson, is present in the courtroom.  Mr. Olson advises that Mr. Lozano will
> not have anything to say on this matter.
>
> [PROSECUTOR]:  I would just respond that [Jose] Lozano's case is
> finished. . . .  [Jose] Lozano's case is done and . . . because he has pled
> guilty and [has] been sentenced, he doesn't have a Fifth Amendment
> privilege.
>
> THE COURT:  I understand that; double jeopardy.
>
> [DEFENSE COUNSEL]:  *Double jeopardy cannot attach to federal
> government—this is a case that alleges firearms, allegedly conspiringly.
> The State cannot preclude the federal government from prosecuting Mr.
> Lozano.  He may very well be subject to charges on those grounds.  That is,
> is a separate sovereign.*
>
> . . . .
>
> . . . [T]he Feds actually have inquired about this case.  They did
> make inquiry.  That is reflected in the discovery.  They asked for
> information or evidence to be provided to them regarding this matter.  From
> a legal standpoint whether the prosecutors would be interested in it is
> irrelevant.  The question is, does the federal government have the power to
> prosecute [Jose] Lozano for what he may be asked on the stand?  And the
> answer is, unquestionably, yes, they do.
>
> . . . .

> THE COURT: All right. I see Mr. Robin Olson is in the courtroom. Mr. Olson was [Jose] Lozano's counsel in the matter for which he was convicted. And I know you are not appointed to represent him in this matter, Mr. Olson, but would you like to weigh in? I'll give you that opportunity.
>
> MR. OLSON: I would, Your Honor. First of all, may it please the Court, I did inform members of the prosecution team that [Jose] Lozano would not be testifying at trial. It was never part of his plea agreement at any point to testify at this trial.
>
> As far as when I recently found out that he was being brought into court, . . . [the prosecutor] approached me, and asked me a question about this Fed thing. I said, yes, I have seen it happen several times. I said, [Jose] Lozano will not testify.
>
> THE COURT: And if . . . he is called to the stand?
>
> MR. OLSON: He will take the Fifth.
>
> THE COURT: All right. I'm going to exclude Mr. Lozano.

RP at 750-55 (emphasis added).

Over the weekend, the State prepared a motion for reconsideration on the court's exclusion of Jose Lozano. The parties presented oral argument on the motion to the court. In its memorandum in support of the motion for reconsideration, the State cited *State v. Ruiz*, 176 Wn. App. 623, 309 P.3d 700 (2013), for the proposition that Jose Lozano had no valid privilege and could be compelled to testify. Defense counsel argued Jose Lozano had a valid privilege because he was subject to federal prosecution under the federal Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961. She contended the situation was different than the situation presented in *Ruiz* because, in *Ruiz*, "[t]here was no allegation of gangs activity, no allegation of any type of

conspiratorial activities, no allegation of any kind of link to any kind of interstate

activity." RP at 929.

> Following argument, the trial court ruled:
>
> The State represents that the questions that it's going to ask are factual.
> Here is a witness who was purportedly an eye witness to the incident. How
> can I, as a trial judge, say, no, you can't call an eye witness? So I'm going
> to reverse myself, and allow Mr. Lozano to testify, and we'll take it [one]
> question at a time.

RP at 932.

> Later in the trial, the State made an offer of proof regarding Jose Lozano's

testimony outside the presence of the jury. Jose Lozano took the stand. The prosecutor

proceeded to ask Jose Lozano several questions to which Jose Lozano answered, "I plead

the Fifth" to all. RP at 1108-15. He answered the same way on cross-examination. The

trial court found the Fifth Amendment privilege did not apply, ordered Jose Lozano to

answer questions, and held him in contempt for refusing to answer.

> The jury was brought back into the courtroom. The following questioning of Jose

Lozano occurred in the presence of the jury:

> [PROSECUTOR:] Sir, would you please state your name for the record.
> [WITNESS:] Jose Lozano.
> [PROSECUTOR:] Do you live here in Walla Walla?
> [WITNESS:] I plead the Fifth.
>     THE COURT: All right. The Court's previously ruled that the Fifth
> Amendment privilege against self-incrimination doesn't apply to [Jose]

15

Lozano's testimony. He has been ordered to answer the questions. Refusal results in him being found in contempt.

Ask your next question, [Prosecutor].

[PROSECUTOR:] If I may approach?

THE COURT: Yes.

. . . .

[PROSECUTOR:] [Jose] Lozano, [I'm] showing you a photograph numbered plaintiff's identification number 155, isn't it true that is your parents' mini van?

[WITNESS:] I plead the Fifth.

. . . .

THE COURT: . . . My ruling is the same on each of these questions just so I don't keep interrupting.

. . . .

[PROSECUTOR:] [Jose] Lozano, isn't it true that you were initially charged with the crime of Murder, two counts of Complicity With Murder in the First Degree regarding this case that you are testifying in?

[WITNESS:] I plead the Fifth.

[PROSECUTOR:] Then isn't it true that subsequent to being charged with those charges that you pled guilty to reduced counts; two counts of Rendering Criminal Assistance in the First Degree?

[WITNESS:] I plead the Fifth.

. . . .

[PROSECUTOR:] Showing you what is marked plaintiff's identification 158, isn't it true that this is the document that you went through and signed regarding pleading guilty to the two counts of rendering criminal assistance?

[WITNESS:] I plead the Fifth.

[PROSECUTOR:] And showing you what's been marked plaintiff's identification number 157, isn't it true that this is a true copy of the Judgment and Sentence in that case where you pled guilty to the two counts of Rendering Criminal Assistance in the First Degree?

[WITNESS:] I plead the Fifth.

. . . .

16

[PROSECUTOR:] [Jose] Lozano, isn't it true that on February 4, 2016, you were interviewed by the Walla Walla Police Department regarding the Walnut Street homicides?

[WITNESS:] I plead the Fifth.

[PROSECUTOR:] And isn't it true that during that interview that you claimed that you did not know anything about what happened that night?

[WITNESS:] I plead the Fifth.

[PROSECUTOR:] And isn't it true that you claimed at that time that you only learned about it through your parents and Facebook?

[WITNESS:] I plead the Fifth.

[PROSECUTOR:] And the last question, [Jose] Lozano, isn't it true that the photograph of the van shown in plaintiff's identification number 155 is the van that you drove that night, August 7, going into the early morning hours of August 8, 2015?

[WITNESS:] I plead the Fifth.

[PROSECUTOR]: I don't have any further questions, Your Honor.

THE COURT: [Defense Counsel], any questions?

[DEFENSE COUNSEL]: Thank you, Your Honor.

CROSS-EXAMINATION

. . . .

[DEFENSE COUNSEL:] [Jose] Lozano, you were aware that the basis for the charges that were brought against you was the statement of Birzavit Carmona Hernandez; is that correct?

[WITNESS:] I plead the Fifth.

THE COURT: My ruling is the same in this line of questioning as well.

. . . .

[DEFENSE COUNSEL:] You were aware that Mr. Birzavit Carmona Hernandez changed his story initially saying that you were a shooter and then later saying you were the driver?

[WITNESS:] I plead the Fifth.

[DEFENSE COUNSEL:] And you, on the guilty plea statement, it indicated that you pleaded guilty to Rendering Criminal Assistance While Being Armed With a Deadly Weapon; is that correct?

17

[WITNESS:]  I plead the Fifth.
[DEFENSE COUNSEL:]  Isn't it true that when you were charged with Murder in the First Degree you were facing a potential maximum sentence of life in prison; is that correct?
[WITNESS:]  I plead the Fifth.
[DEFENSE COUNSEL:]  And when you were offered the reduction in charges to Criminal Assistance in the First Degree you were facing a range of 12 months to 14 months in prison; is that correct?
[WITNESS:]  I plead the Fifth.
[DEFENSE COUNSEL:]  [Jose] Lozano, did you take this guilty plea because it was better than the risk of the downside of [a] bad verdict at trial?
[WITNESS:]  I plead the Fifth.
[DEFENSE COUNSEL:]  Did you actually do the events that you pleaded guilty to to get the advantage of that plea agreement?
[WITNESS:]  I plead the Fifth.
. . . .

REDIRECT EXAMINATION

. . . .
[PROSECUTOR:]  . . . [Jose] Lozano, isn't it true that you were not offered that you were not, that no threats were made or promises were made to you when you pled guilty to the rendering criminal assistance charges.
[WITNESS:]  I plead the Fifth.
     [PROSECUTOR]:  I have no further questions, Your Honor.

RP at 1118-23.

*Ballistics evidence*

The State's witness who performed the autopsy stated he gave the bullets he removed from the bodies to law enforcement.  The bullets recovered from Ms. Rojas's body were both .25 caliber and .9 millimeter bullets.

18

Additionally, as part of its evidence against Mr. Quintero, the State sought to introduce evidence from two other shootings, one that occurred at the Taj gas station in Milton-Freewater, Oregon. It contended that Mr. Quintero was involved in both prior shootings and a witness saw Mr. Quintero firing his gun in the direction of a Ford Mustang at the Taj. A bullet was later recovered from the Mustang. The State argued the bullet recovered from the Mustang at the Taj shooting matched the bullets recovered from the Walnut Street murders and the gun that was used belonged to Mr. Quintero. Detective Marlon Calton stated law enforcement tested shell casings from the three shootings. He stated the shell casing evidence showed that the same gun was used in all three shootings.

The State called two Washington State Patrol Crime Laboratory analysts, Brian Smelser and Kathy Geil. Mr. Smelser testified that of the 29 fired .9 millimeter Luger caliber cartridges he examined from the three different crime scenes, it was his opinion that all of them were fired from the same firearm. Ms. Geil, on the other hand, provided a lengthy discussion on the criticisms of ballistics science and its susceptibility to subjectivity.

Mr. Quintero's defense counsel cross-examined both analysts at length. Mr. Smelser admitted there are variances on the markings on bullets even when bullets are

19

fired from the same firearm. It was his job to distinguish which differences were

indicative of a separate firearm and which ones were within the range of tolerance for the

same firearm. Mr. Smelser admitted the determination is a subjective one based on his

judgment and opinion. He further admitted that subjective opinions are more susceptible

to bias. When defense counsel asked if it was true that recent scientific reports had

criticized the types of analyses used by the crime lab because they have the potential to be

affected by bias, Mr. Smelser said it was. He admitted that bullet identification did not

have the same level of certainty that other types of science does. He further admitted that

his analysis might be biased because law enforcement agencies were hopeful that the

bullets from the three shootings matched. The defense did not call its expert, Dr.

Grimsbo.

In closing argument, the prosecutor argued to the jury that it should infer Mr.

Quintero's guilt from Jose Lozano's refusal to testify. The prosecutor argued:

> Then you saw Mr. Lozano, Jose Lozano on the stand. You really didn't
> hear anything from him other than his name. But what you heard was
> deafening silence. . . . So he was charged . . . with the Murder, but then
> pled guilty to . . . Rendering Criminal Assistance . . . .
>       . . . But he is still a gang member. And so his silence can be
> reasonably inferred to tell you that he's not protecting himself, because he
> doesn't need that protection any more. So who is he protecting? He is not
> protecting the State. The only person that he can reasonably be protecting is
> the defendant, so that he's not a snitch.

> So the State respectfully submits to you that one of the two people that he was rendering criminal assistance to was Mr. Quintero.

RP at 1325-26.

The jury found Mr. Quintero guilty of both counts of murder in the first degree and guilty of unlawful possession of a firearm in the first degree. But in its special verdict answer, if found that Mr. Quintero was not armed with a firearm during the commission of either murder.

*Sentencing*

Prior to sentencing, Mr. Quintero filed a sentencing memorandum in the trial court. He asked the court to consider the mitigating factor of youthfulness as he was 21 years old when he committed his crimes. Mr. Quintero's brief explained that he regretted his decision to join the gang, but the violence and insecurity present in his childhood home led him to make that choice. And, after being removed from the negative influence of his home life and peer group, Mr. Quintero showed great potential to behave responsibly. Mr. Quintero asked the court to impose an exceptional sentence below the standard range and impose concurrent terms of confinement based on his youthfulness and transient immaturity.

Before the court announced Mr. Quintero's sentence, the court stated: "I did take into consideration the defendant's life situation, age, maturity level, those sorts of things.

21

Frankly, under the circumstances, it didn't count for a whole lot. Life is not cheap and it doesn't get taken lightly." RP at 1474.

The court sentenced Mr. Quintero to 480 months on count 1 (first degree murder), 300 months on count 2 (first degree murder), and 54 months on count 3 (first degree unlawful possession of firearm). The court ordered count 1 and count 2 to be served consecutive and count 3 to run concurrent.

*Direct appeal*

Mr. Quintero filed a direct appeal. He argued the trial court abused its discretion and deprived him of his constitutional right to a fair trial by not allowing him to cross-examine Mr. Carmona Hernandez and Mr. Bante Rivera about the State's promise to assist them should they apply for a U visa. *State v. Quintero*, No. 35752-0-III, slip op. at 11 (Wash. Ct. App. Jan. 7, 2020) (unpublished), https://www.courts.wa.gov/ opinions/pdf/357520_unp.pdf.

A U visa can be obtained by someone illegally in the United States who has helped law enforcement investigate or prosecute a qualifying crime. *Id.* at 1. Several appellate courts from around the country have held that where a State's witness in a criminal trial had applied for a U visa and had been promised State support for the application, the defendant must be allowed to question the witness about that possible motivation for the

22

witness's testimony. *Id.* at 13. In the unpublished opinion, we rejected the argument because, by the time of trial, there was no evidence that either witness in fact had applied for such a visa. *Id.* at 14, 16-17. We issued our mandate on December 10, 2020.

*Timely PRP*

Mr. Quintero filed this timely personal restraint petition on November 23, 2021, shortly before the one-year time bar. *See* RCW 10.73.090(1), (3)(b). We called for an answer, the State responded, and Mr. Quintero replied. We then referred Mr. Quintero's petition to a panel, assigned counsel to represent him, and permitted supplemental briefs.

Petitioner's counsel filed a supplemental brief, and the State responded. Petitioner's counsel later withdrew to pursue other employment.

We noticed that petitioner's supplemental brief failed to address the fourth and fifth grounds of Mr. Quintero's timely PRP. We appointed substitute counsel and directed counsel to address those grounds in a second supplemental brief. In the second supplemental brief, filed April 3, 2023, petitioner's counsel addressed those claims and raised three arguably new claims—a confrontation clause violation, prosecutorial misconduct, and cumulative error. The State responded and argued in part that the cumulative error claim was a new untimely claim that caused the petition to be mixed and necessitated the dismissal of the PRP.

23

ANALYSIS

Collateral review from a conviction is an extraordinary remedy that seeks to disturb a final judgment; therefore, a personal restraint petitioner must meet a high standard to obtain relief. *In re Pers. Restraint of Finstad*, 177 Wn.2d 501, 506, 301 P.3d 450 (2013). When seeking postconviction relief, a petitioner must demonstrate that they were actually and substantially prejudiced as a result of constitutional error or that the trial suffered from a fundamental defect of a nonconstitutional nature that resulted in a complete miscarriage of justice. *In re Pers. Restraint of Swagerty*, 186 Wn.2d 801, 807, 383 P.3d 454 (2016). Actual prejudice is determined by evaluating the totality of the circumstances. *In re Pers. Restraint of Brockie*, 178 Wn.2d 532, 539, 309 P.3d 498 (2013). The petitioner bears the burden of demonstrating prejudice. *Id.*

The petitioner must state with particularity facts that, if proved, would entitle the petitioner to relief. *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086 (1992). Bald assertions and conclusory allegations are not sufficient nor are arguments made only in broad general terms. *Id.*; *In re Pers. Restraint of Rhem*, 188 Wn.2d 321, 327, 394 P.3d 367 (2017). A petitioner may support a petition by relating material facts within the petitioner's personal knowledge, even if the petitioner's version of the facts is self-serving. *In re Pers. Restraint of Ruiz-Sanabria*, 184 Wn.2d 632, 641, 362 P.3d 758

24

(2015). Factual allegations must be based on more than mere speculation, conjecture, or inadmissible hearsay. *Rice*, 118 Wn.2d at 886.

We first analyze each of Mr. Quintero's grounds in his petition and determine whether he has established the presence of any error. If so, we then apply the appropriate standard of review for prejudice, depending on whether the error is constitutional or nonconstitutional.

A.    GROUNDS ASSERTED FOR RELIEF

FIRST GROUND: SUFFICIENCY OF THE EVIDENCE

Mr. Quintero makes three arguments challenging the sufficiency of the State's evidence against him.

In the context of a collateral attack, "[a] conviction based on insufficient evidence contravenes the due process clause of the Fourteenth Amendment [to the United States Constitution] and thus results in unlawful restraint." *In re Pers. Restraint of Martinez*, 171 Wn.2d 354, 364, 256 P.3d 277 (2011). When reviewing a sufficiency of the evidence claim, this court must determine "'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (emphasis omitted) (plurality opinion) (quoting *Jackson v. Virginia*,

443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)).  "A claim of insufficiency

admits the truth of the State's evidence and all inferences that reasonably can be drawn

therefrom."  *State v. Walton*, 64 Wn. App. 410, 415, 824 P.2d 533 (1992).  "This standard

is a deferential one, and questions of credibility, persuasiveness, and conflicting

testimony must be left to the jury."  *Martinez*, 171 Wn.2d at 364.  Both direct evidence

and circumstantial evidence are equally reliable in making a sufficiency of the evidence

determination.  *State v. Scanlan*, 193 Wn.2d 753, 770, 445 P.3d 960 (2019).

> 1.  *Sufficiency of evidence that Mr. Quintero and an accomplice acted with premeditated intent to cause the death of both victims*

For ease of analysis, we combine Mr. Quintero's first and second sufficiency

challenges under one heading.  He argues the State presented insufficient evidence to

prove beyond a reasonable doubt that he and an accomplice acted with premeditated

intent to cause the death of the victims.[3]

---

[3] The to-convict instructions for the murder charges required the State to prove "the defendant, or an accomplice, caused the death" of each victim.  PRP, App. A, B (instructions 8 and 9).  These instructions deviated from the typical instruction, which would have required the State to prove that the defendant, as principal or accomplice, caused the death of the victim.

Mr. Quintero argues this error implicates the alternative means doctrine and because the State failed to select one of the two means, required it to prove that *both* he and an accomplice committed murder in the first degree.  We disagree.

Premeditation is an essential element of first degree murder. RCW 9A.32.030(1)(a).

"Premeditation must involve more than a moment in time; it is defined as the deliberate

formation of and reflection upon the intent to take a human life and involves the mental

process of thinking beforehand, deliberation, reflection, weighing or reasoning for a

period of time, however short." *State v. Hoffman*, 116 Wn.2d 51, 82-83, 804 P.2d 577

(1991) (footnote omitted). "Premeditation can be shown by circumstantial evidence

where the inferences drawn by the jury are reasonable and the evidence supporting the

jury's verdict is substantial." *State v. Rehak*, 67 Wn. App. 157, 164, 834 P.2d 651 (1992).

"Four characteristics of the crime are particularly relevant to establish

premeditation: motive, procurement of a weapon, stealth, and the method of killing."

*State v. Pirtle*, 127 Wn.2d 628, 644, 904 P.2d 245 (1995). "The planned presence of

weapons supports an inference of premeditation." *Hoffman*, 116 Wn.2d at 83. Evidence

that the defendant engaged in multiple acts of violence also supports an inference of a

premeditated act. *Id.* at 84. In *Rehak*, Division Two of this court held that a reasonable

trier of fact could find premeditation where the killer prepared the gun, crept up behind

---

The alternative means doctrine applies to an offense that the legislature has defined as being committed by more than one means. *State v. Smith*, 159 Wn.2d 778, 784, 154 P.3d 873 (2007). That is not the case here. Nevertheless, for the reasons shown in our discussion of this issue, the State did present sufficient evidence that Mr. Quintero *and* an accomplice committed murder in the first degree.

27

the victim who was sitting quietly in a chair in a nonconfrontational posture, and shot the victim three separate times. *Rehak*, 67 Wn. App. at 164.

In this case, a reasonable trier of fact could find that Mr. Quintero and Mr. Lozano premeditated the killing of Ms. Rojas and Mr. Cano. Mr. Quintero told his cellmates that he and Mr. Lozano shot and killed Ms. Rojas and Mr. Cano because she was a "snitch." RP at 1131. The evidence suggested that once at Ms. Rojas's home, Mr. Quintero and Mr. Lozano decided they needed to kill Mr. Cano, too. Mr. Quintero argues that no motive to kill Mr. Cano was identified at trial. We disagree, killers have a motive to ensure that no witness can identify them. Mr. Cano was a witness.

Moreover, motive is not the only characteristic of premeditation. Both Mr. Quintero and Mr. Lozano were armed with handguns when they arrived at Ms. Rojas's house, suggesting they planned to shoot her. Mr. Quintero and Mr. Lozano also concealed their approach by parking down the street from Ms. Rojas's house, indicating they used stealth and it was their plan to surprise the victims. Further, the fact that Ms. Rojas was shot 11 times and Mr. Cano was shot 5 times (multiple acts of violence) supports an inference of premeditation.

We conclude that the State provided sufficient evidence from which a jury might reasonably have found beyond a reasonable doubt that Mr. Quintero and Mr. Lozano

acted with premeditation in the killing of Ms. Rojas and Mr. Cano.

> 2.     *Accomplice liability is not an alternative means crime*

Jury instruction 10, a pattern instruction, defined accomplice liability. It provided

in relevant part:

> A person is an accomplice in the commission of the crime if, with
> knowledge that it will promote or facilitate the commission of the crime, he
> or she either:
>     (1) solicits, commands, encourages, or requests another person to
> commit the crime; or
>     (2) aids or agrees to aid another person in planning or committing the
> crime.

PRP, App. C.

Mr. Quintero argues the inclusion of two different means for finding a person an

accomplice required the State to either elect one means or prove both beyond a reasonable

doubt. We disagree that being an accomplice is an alternative means crime.

Criminal defendants have a constitutional right to a unanimous jury verdict.

*State v. Ortega-Martinez*, 124 Wn.2d 702, 707, 881 P.2d 231 (1994). When a criminal

defendant is charged with committing a crime by alternative means, Washington's

Constitution, article I, section 21 requires the jury to be unanimous as to which alternative

means the defendant used to commit the crime only if the evidence is insufficient to

support any one of the means. *Id.* at 707-08. Therefore, if the State fails to elect which

alternate means it intends to prove, the rule requiring jury unanimity is violated unless sufficient evidence supports each alternative means beyond a reasonable doubt. *State v. Owens*, 180 Wn.2d 90, 95, 323 P.3d 1030 (2014).

Alternative means crimes are ones that provide that the proscribed criminal conduct may be proved in a variety of ways. *State v. Smith*, 159 Wn.2d 778, 784, 154 P.3d 873 (2007). As a general rule, such crimes are set forth in a statute stating a single offense, under which are set forth more than one means by which the offense may be committed. *Id.*

First, because being an accomplice is not a crime in itself, the alternative means doctrine has no application here. Second, a definitional instruction does not implicate the alternative means doctrine. *Id.* at 787; *State v. Linehan*, 147 Wn.2d 638, 646-47, 56 P.3d 542 (2002). For this reason, also, the alternative means doctrine has no application here.

SECOND GROUND: INCONSISTENT JURY VERDICTS

Mr. Quintero argues his right to due process was violated when the jury found him guilty of two counts of first degree murder while simultaneously finding he was not armed with a firearm during the commission of those crimes. Although we agree the verdicts were inconsistent, we disagree that Mr. Quintero was denied his right to due process.

30

Due process does not require inconsistent verdicts to be vacated. *State v. Goins*, 151 Wn.2d 728, 738, 92 P.3d 181 (2004). Juries return inconsistent verdicts for various reasons, including mistake, compromise, and lenity. *Id.* at 733. "[T]he trial and appellate courts provide a safeguard from jury error by independently evaluating whether the guilty verdict rested on sufficient evidence." *Id.* If so, verdict inconsistency is an insufficient reason to reverse a jury's verdicts. *Id.* at 734; *accord State v. McNeal*, 145 Wn.2d 352, 37 P.3d 280 (2002); *State v. Ng*, 110 Wn.2d 32, 750 P.2d 632 (1988). As mentioned previously, there is sufficient evidence to sustain both first degree murder convictions.

THIRD GROUND: INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

Mr. Quintero argues he is entitled to relief because, in four ways, he received ineffective assistance of trial counsel.

To be entitled to collateral relief in a PRP raising an ineffective assistance of counsel claim, the petitioner must show both that (1) defense counsel's representation was deficient, and (2) the deficient representation was prejudicial. *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 840, 846-47, 280 P.3d 1102 (2012) (citing *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). Representation is deficient if, after considering all the circumstances, it falls below an objective standard of reasonableness. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011). A petitioner

alleging ineffective assistance of counsel must overcome a strong presumption that counsel's performance was reasonable. *Id.* "When counsel's conduct can be characterized as legitimate trial strategy or tactics, performance is not deficient." *State v. Kyllo*, 166 Wn.2d 856, 863, 215 P.3d 177 (2009). A petitioner establishes actual and substantial prejudice if the petitioner meets the standard of prejudice applicable on direct appeal: that but for counsel's deficient performance there is a reasonable probability the outcome would have been different. *In re Pers. Restraint of Lui*, 188 Wn.2d 525, 538, 397 P.3d 90 (2017). If one prong of the test fails, this court need not address the remaining prong. *State v. Crow*, 8 Wn. App. 2d 480, 507, 438 P.3d 541 (2019).

*1. Failure to investigate an alibi witness and call her as a witness*

Mr. Quintero claims his trial counsel's performance was deficient when she failed to investigate an alibi witness, Camille Mason, and call her as a witness at trial to testify in support of his alibi that he was at Jakelin Villalpando's house the night of the murders.

Prior to trial, Mr. Quintero's trial counsel sent a letter to him and explained:

> I spoke with Camille today. She says that she remembers dropping you off at [Ms. Villalpando's] house that night with [Mr. Lozano] and going to sleep before being woken up by her phone to learn about the shooting. We will talk more about her statement when I visit.

PRP, App. F at 2. Mr. Quintero claims, after his visit with counsel, that he believed the alibi witness would be called to testify, but trial counsel did not call her. He claims the

32

outcome of his trial would have been different had trial counsel called Ms. Mason to support his alibi.

Ms. Villalpando testified that Mr. Quintero had called her in April 2016, several months after the Walnut Street murders, and asked if she remembered him being at her house the night of the murders. She testified that she told Mr. Quintero she "did not recall," but it was possible. RP at 902.

Mr. Quintero's argument that his trial counsel's performance was deficient for *failing to investigate* Ms. Mason as an alibi witness is without merit. "[A] defendant seeking relief under a 'failure to investigate' theory must show a reasonable likelihood that the investigation would have produced useful information not already known to the defendant's trial counsel." *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 739, 101 P.3d 1 (2004). Mr. Quintero cannot do so. The only evidence Mr. Quintero provides is the evidence already known to his trial counsel—that Ms. Mason would testify she had dropped off Mr. Quintero and Mr. Lozano at Ms. Villalpando's house the night of the murders.

His argument that his trial counsel's performance was deficient for *failing to call* Ms. Mason to testify also is without merit. Mr. Quintero's presence at Ms. Villalpando's house the night of the murders did not preclude him also from driving with the Lozano

brothers at some other time that night. Ms. Mason's testimony provided little help, but it provided evidence that he and Mr. Lozano were together the night of the murders. Trial counsel may well have reasonably determined that Ms. Mason's testimony would be more harmful than helpful.

2. *Failure to call the defense's ballistics expert*

Mr. Quintero argues he received ineffective assistance of counsel when his trial counsel failed to call his ballistics expert to contradict the State's experts. Ordinarily, the decision "to call a witness is a matter of legitimate trial tactics that presumptively does not support a claim of ineffective assistance of counsel." *State v. Davis*, 174 Wn. App. 623, 639, 300 P.3d 465 (2013). "A defendant can overcome this presumption by showing that counsel failed to adequately investigate or prepare for trial." *Id.*

Mr. Quintero's trial counsel's decision not to call a ballistics expert was a legitimate trial strategy. Defense counsel successfully cross-examined the State's ballistic experts and neither provided helpful evidence to the State. Because both confirmed the subjectivity and faults in ballistics testing, defense counsel likely concluded that calling their own expert would be unnecessary. Mr. Quintero fails to overcome the strong presumption that trial counsel's performance was reasonable.

*3. Failure to request jury instructions on lesser included offenses*

Mr. Quintero contends his trial counsel's performance was deficient because she should have realized from the inconsistent verdicts that the jury had trouble arriving at a decision, and she should have objected to the inconsistent verdicts and submitted a lesser included instruction such as one for second degree murder. He argues that had she done this, the jury may have returned guilty verdicts for two counts of second degree murder.

This argument is unduly speculative. If the jury was given the option of second degree murder and told to return a consistent verdict, it is possible the jury would have returned two guilty verdicts for first degree murder and two firearm enhancements. This is because the evidence of premeditation, at least as to Ms. Rojas, was overwhelming. Alternatively, it is possible the jury would have returned one guilty verdict for first degree murder, one guilty verdict for second degree murder, and two firearm enhancements. Because the two firearm enhancements would have added 10 years to Mr. Quintero's sentence, under this scenario, his sentence probably would have been higher than his

current sentence.[4]  We reject Mr. Quintero's argument because he cannot establish, but

for counsel's purported deficient performance, the outcome probably would have been

better.

   *4.  Failure to object to inconsistent verdicts*

   Lastly, Mr. Quintero argues his trial counsel's performance was deficient because

she failed to object to the inconsistent jury verdicts.  *Goins* recognizes that not objecting

to inconsistent verdicts can be a legitimate defense strategy.  *Goins*, 151 Wn.2d at 732.

As noted in the preceding section, an objection may well have resulted in a more severe

sentence.

   FOURTH GROUND: VIOLATION OF RIGHT TO FAIR TRIAL

   This fourth ground requires us to closely examine the arguments made in Mr.

Quintero's timely petition and to determine whether arguments made later, in his second

---

   [4] According to the judgment and sentence, the court entered an offender score of "8" for count 1 (first degree murder of Ms. Rojas), and "0" for count 2 (first degree murder of Mr. Cano).  CP at 200.  On count 2, the standard range sentence was 240 to 320 months.

   The standard range sentence for second degree murder with an offender score of "0" was 123 to 220 months.  *See* Sentencing Grid, RCW 9.94A.510; RCW 9.94A.515 (seriousness level XIV).  Adding 120 months for two firearm enhancements results in a standard range sentence for count 2 of 243 to 343 months.  RCW 9.94A.533(3)(a).  This is slightly higher than 240 to 320 months.

supplemental brief, raise new arguments and, if so, how that impacts Mr. Quintero's

petition. We first discuss timeliness requirements.

A petitioner challenging a judgment and sentence has one year from the

time the judgment and sentence becomes final to file a personal restraint petition.

RCW 10.73.090(1), (2). In a supplemental brief, appointed counsel can only raise issues

not included in an original timely petition if they are raised within the one-year statutory

deadline or are issues that fall within an exception to the time bar. *See In re Pers.*

*Restraint of Benn*, 134 Wn.2d 868, 938-40, 952 P.2d 116 (1998) (denying petitioner's

motion to file supplemental brief beyond one-year statutory deadline because new

arguments do not relate back to original petition and are thus untimely).

Here, Mr. Quintero's judgment became final on December 10, 2020, when we

issued our mandate disposing of his direct appeal. RCW 10.73.090(3)(b). His petition,

filed in our court on November 23, 2021, is timely. But his second supplemental brief

that was filed in the spring of 2023 is not timely. Thus, any new arguments raised in that

brief are untimely.

In the *heading* of Mr. Quintero's fourth ground in his timely petition, Mr. Quintero

asserts he was deprived of his "right to a fair trial under the Sixth and Fourteenth

Amendments of the U.S. Constitution and article I, § 22 and [§] 3 of the Washington

constitution" when the judge (1) admitted unrelated rap lyrics as evidence, and (2) held

Jose Lozano in contempt numerous times in the presence of the jury. PRP at 30. In the

*body* of his argument, however, his fair trial claims relate solely to the rap lyric ruling and

requiring Jose Lozano to repeatedly assert the Fifth Amendment during his testimony.

Mr. Quintero repeatedly cites cases discussing the state and federal due process clauses,

not the Sixth Amendment. For this reason, we conclude that his fourth ground for relief

is limited to the due process clauses of the Fifth Amendment to the United States

Constitution and article I, section 3 of the Washington Constitution.

In Mr. Quintero's second supplemental brief, he raises Sixth Amendment claims—

violation of his right to confront witnesses and prosecutorial misconduct. The closest Mr.

Quintero comes to raising a Sixth Amendment claim in his timely PRP is when he argues:

"The [S]tate was able to unfairly capitalize on the judge's abuse of discretion [of

requiring Jose Lozano to repeatedly assert the Fifth Amendment] by referencing [Jose]

Lozano's silence in closing arguments; thus, prejudicing [his] right to a fair trial." PRP at

32. The gravamen of this argument relates to prejudice caused by the trial court's ruling,

not prosecutorial misconduct.

Because Mr. Quintero did not timely raise the Sixth Amendment claims of

confrontation clause violation or prosecutorial misconduct, we will not consider them.

No. 38585-0-III
*In re Pers. Restraint of Quintero*

*See Benn*, 134 Wn.2d at 938-40 (not considering claim first raised in late supplemental brief).

### 1. Admission of the rap lyrics

Mr. Quintero argues that the admission of the rap lyrics he composed violated his due process rights to a fair trial. We first determine whether the trial court abused its discretion by admitting the lyrics and, if so, we then determine whether the violation was a constitutional or a nonconstitutional error.

This court reviews a trial court's evidentiary rulings for abuse of discretion. *State v. Rice*, 48 Wn. App. 7, 11, 737 P.2d 726 (1987). A trial court abuses its discretion if no reasonable person would take the view adopted by the trial court. *State v. Jennings*, 199 Wn.2d 53, 59, 502 P.3d 1255 (2022). Under ER 402, "[a]ll relevant evidence is admissible." "Relevant evidence" means evidence tending to make the existence of any fact that is of consequence more probable or less probable. ER 401.

On the other hand, relevant evidence may be excluded if its probative value is substantially outweighed by considerations including unfair prejudice, or other considerations including needless presentation of cumulative evidence. ER 403.

Under ER 404(b),

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The State, relying on ER 404(b), argued the lyrics were relevant because they proved Mr. Quintero's motive to commit the murders. Yet the trial court admitted the lyrics, not to show motive, but as an admission to the Walnut Street murders. "'A trial court's ruling on the admissibility of evidence will not be disturbed on appeal if it is sustainable on alternative grounds.'" *Gilmore v. Jefferson County Pub. Transp. Benefit Area*, 190 Wn.2d 483, 498, 415 P.3d 212 (2018) (quoting *Thomas v. French*, 99 Wn.2d 95, 104, 659 P.2d 1097 (1983)). For this reason, we consider both "motive" and "admission" as possible bases for admitting the lyrics.

> a.  *Lyrics as evidence of motive: cumulative, prejudicial, and abuse of discretion*

Evidence showing motive may be admissible even though "the State is not required to prove motive as an element of [first degree murder]." *State v. Boot*, 89 Wn. App. 780, 789, 950 P.2d 964 (1998). "Motive is an inducement which tempts a mind to commit a crime." *Id*. Establishing motive "is often necessary when only circumstantial evidence is available." *State v. Athan*, 160 Wn.2d 354, 382, 158 P.3d 27 (2007).

Here, the State did not rely only on circumstantial evidence to prove Mr. Quintero's motive. There was ample direct evidence of motive without admitting the rap lyrics. The State produced uncontroverted evidence that Mr. Quintero and Mr. Lozano were members of the same street gang, that one of the victims had been an informant resulting in Mr. Lozano's arrest and conviction, that gang culture discouraged "snitching," and that "snitches" could be murdered.

The rap lyrics were thus cumulative of uncontroverted evidence and, if the lyrics were unduly prejudicial, their admission was likely erroneous.

Mr. Quintero cites a Washington case discussing the prejudicial impact of violent fictional writings to show character or motive. This case is *State v. Hanson*, 46 Wn. App. 656, 731 P.2d 1140 (1987). In *Hanson*, the defendant was found guilty of first degree assault. *Id.* at 658-59. On appeal, he argued the trial court erred in allowing the prosecutor to cross-examine him using violent fiction he had written. *Id.* at 659. He contended the questions regarding his fiction were irrelevant to his character for nonviolence and were prejudicial. *Id.* at 660-61. The defendant argued "[a]bsent an obvious reason why Hanson would have committed the crime, the jury may have seized on the correlation between certain elements of his fiction and aspects of his personal life,

41

to conclude that [he] was a violent person who was likely to commit this violent crime."

*Id.* at 661 (footnote omitted). In addressing this argument, we reasoned:

> Assuming arguendo that the defendant placed his character for nonviolence in issue during his direct testimony, we hold that his writings were irrelevant to rebut this character evidence. Without some further foundation, the defendant's writings were simply not probative. A writer of crime fiction, for example, can hardly be said to have displayed criminal propensities through works he or she has authored.
>
> Even if we were to assume that [the defendant's] writings were probative of his character, any probative value would be overwhelmed by the danger of unfair prejudice. The crime charged was a random, brutal act of violence for which there was no apparent motive. By suggesting that the defendant's character conformed to the violent acts in his writings, the State supplied the jury with an improper explanation for why the defendant would have committed the crime charged.

*Id.* at 662. We held that admission of the fictional writings was reversible error, and we remanded for a new trial. *Id.* at 664.

Because the lyrics, as evidence of motive, were highly prejudicial and cumulative of uncontradicted evidence of motive, we conclude the trial court would have abused its discretion had it admitted the lyrics for the State's proffered purpose.

   b. *Lyrics to show admission, abuse of discretion*

This specific issue, as it relates to rap lyrics, appears to be one of first impression in Washington. Cases from other jurisdictions with similar fact patterns are persuasive on this issue.

42

In *State v. Skinner*, 218 N.J. 496, 501, 95 A.3d 236 (2014), the defendant and the victim were members of a drug dealing group. The defendant and victim's relationship became strained over money. *See id.* One night, the defendant lured the victim to a park under the guise of setting up a drug sale. *Id.* at 501-02. When the victim arrived at the park, the defendant brandished a firearm and shot the victim. *Id.* at 502. The defendant's vehicle was at the scene and police obtained a warrant to search his car. *Id.* In it, police discovered three notebooks filled with rap lyrics authored by the defendant. *Id.* The lyrics were profane and violent. *Id.* Many of the lyrics were written in the first person under the moniker "Real Threat" and the defendant had "Threat" tattooed on his left arm. *Id.* at 502-03. All of the lyrics were written before the shooting. *Id.* at 503.

A grand jury indicted the defendant, charging him with first degree attempted murder. *Id.* Prior to trial, the defendant objected to the State admitting his rap lyrics into evidence. *Id.* The trial court ruled the lyrics were admissible under ER 404(b) because they "provided insight into [the] defendant's alleged motive and intent." *Id.* At trial, a detective read the defendant's lyrics to the jury. *Id.* at 504. "The material was replete with expletives and included graphic depictions of violence, bloodshed, death, maiming, and dismemberment." *Id.* The lyrics "plainly depict[ed] various crimes and other bad acts, but those crimes and acts were unconnected to the specific facts of the attempted-

murder charge against defendant." *Id.* at 505. The jury was instructed to consider the

lyrics only for the limited purpose of establishing motive or intent, and not as substantive

evidence of guilt. *Id.* at 509. Ultimately, the jury convicted the defendant of attempted

murder. *See id.*

The defendant appealed and New Jersey's appellate court reversed the defendant's

conviction. *Id.* at 506-07. The State then appealed to the New Jersey Supreme Court.

*Id.* at 507. The New Jersey Supreme Court intertwined its analysis of the defendant's

ER 403 and ER 404(b) arguments:

> [D]efendant's graphically violent rap lyrics could be fairly viewed as
> demonstrative of a propensity toward committing, or at the very least
> glorifying, violence and death. That prejudicial effect overwhelms any
> probative value that these lyrics may have. In fact, we detect little to no
> probative value to the lyrics whatsoever.

*Id.* at 521. It reasoned,

> [t]he difficulty in identifying probative value in fictional or other forms of
> artistic self-expressive endeavors is that one cannot presume that, simply
> because an author has chosen to write about certain topics, he or she has
> acted in accordance with those views. One would not presume that Bob
> Marley, who wrote the well-known song "I Shot the Sheriff," actually shot
> a sheriff, or that Edgar Allan Poe buried a man beneath his floorboards, as
> depicted in his short story "The Tell-Tale Heart," simply because of their
> respective artistic endeavors on those subjects. Defendant's lyrics should
> receive no different treatment.

*Id.* at 521-22. The New Jersey Supreme Court concluded,

44

> [f]ictional forms of inflammatory self-expression, such as poems, musical compositions, and other like writings about bad acts, wrongful acts, or crimes, are not properly evidential unless the writing reveals a *strong nexus* between the specific details of the artistic composition and the circumstances of the underlying offense for which a person is charged, and the probative value of that evidence outweighs its apparent prejudicial impact. In the weighing process, trial courts should consider the existence of other evidence that can be used to make the same point. When admissible, such evidence should be carefully redacted to ensure that irrelevant and inflammatory content is not needlessly presented to the jury.

*Id.* at 500 (emphasis added). The court affirmed the appellate court's ruling reversing the defendant's conviction and remanded for a new trial. *Id.* at 525.

In *Hannah v. State*, 420 Md. 339, 342-46, 23 A.3d 192 (2011), the State offered into evidence rap lyrics authored by the defendant. The Maryland Court of Appeals concluded that where "there [was] no evidence that [the defendant's] lyrics [were] autobiographical statements of historical fact," the prejudicial impact of the lyrics was overwhelming. *Id.* at 349-50. The lyrics "had no tendency to prove any issue other than the issue of whether [the defendant] was a violent thug with a propensity to commit the crimes for which he was on trial." *Id.* at 357. The *Hannah* court remanded for a new trial. *Id.*

In *Greene v. Commonwealth*, 197 S.W.3d 76, 79 (Ky. 2006), a defendant was convicted of murdering his wife. On appeal, the defendant claimed the trial court erred when it admitted portions of a "'hip hop'" video depicting the defendant rapping about

45

his wife's death. *Id.* Medical evidence admitted at trial established that the defendant killed his wife by cutting her throat. *Id.* The rap video, which was played during trial, depicted the defendant saying things such as "'I ain't got no f—ing wife,'" "'I cut her motherf—in' neck with a sword,'" and "'I'm sittin' in the cell starin' at four walls.'" *Id.* at 86. The defendant argued the rap video was simply character evidence introduced to prove his criminal disposition. *Id.* at 87. The Kentucky Supreme Court concluded the probative value of the evidence was not substantially outweighed by the prejudicial effect because "the video refers to [the defendant's] actions and emotions regarding this crime, not a previous offense, [and] the video establishes premeditation and motive in [the defendant's] own words." *Id.* The court affirmed the trial court's admission of the video. *Id.*

In *Holmes v. State*, 129 Nev. 567, 569, 306 P.3d 415 (2013), the defendant was convicted of first degree murder and robbery. Two men, the defendant and another assailant, wore ski masks and accosted the victims in the parking lot of a recording studio. *Id.* at 570. During the fight, one of the victim's pockets was turned inside out, his shirt and necklace were torn off, he was pistol-whipped, and later shot to death. *Id.* While awaiting extradition to Nevada, the defendant penned a rap song titled "'Drug Deala.'" *Id.* at 572. The trial court admitted the following lyrics:

46

> "But now I'm uh big dog, my static is real large. Uh neighborhood super star. Man I push uh hard line. My attitude shitty nigga you don't want to test this. I catching slipping at the club and jack you for your necklace. Fuck parking lot pimping. Man I'm parking lot jacking, running through your pockets with uh ski mask on straight laughing."

*Id.* The jury was given a limiting instruction: "'[T]hese rap lyrics [are] not to be considered by you to prove that the defendant is a person of bad character or that he has a disposition to commit a crime. . . . You may . . . consider if the above lyrics are confessions, admissions, o[r] neither.'" *Id.* at 572-73 (alterations in original).

The Nevada Supreme Court noted that only a single stanza from "Drug Deala" was admitted at trial and the portion that was admitted relayed facts much like the crime charged. *Id.* at 574. Based on the limiting instruction, the court reasoned that if the jury followed the instructions, they only would have considered the lyrics if they found them to be autobiographical, like a diary or journal entry. *Id.* at 575-76. It held that "[e]ven though the lyrics were prejudicial, the district court did not abuse its discretion in determining that the risk they carried of unfair prejudice did not substantially outweigh their probative value." *Id.* at 576.

The foregoing case explanations demonstrate that, unless there is a strong nexus between the lyrics and the crimes charged, the probative effect of admitting violent lyrics or writings into evidence is substantially outweighed by the danger of unfair prejudice.

47

In his timely petition, Mr. Quintero emphasizes that the lead detective in the case saw no connection between his lyrics and the Walnut Street murders. In his second supplemental brief, Mr. Quintero argues redacting the lyrics took them out of context and that none of the lyrics presented to the jury have a factual nexus to the crimes for which he was charged. To address this argument, we must analyze several lines of Mr. Quintero's lyrics.

The first set of lyrics, "G-CODE" had 54 lines, but the jury saw only a few of them. The first line admitted at trial was "CASES GOING COLD NO MATTER HOW MUCH DEDICATION THIS AINT BRAGGIN." Mr. Quintero contends this line is not tied to the facts of this case because the redacted line before it states "WE GOT THEM FEDS IN TOWN HOMICIDE INVESTIGATIONS." CP at 61. He notes that there was not a federal homicide investigation of the Walnut Street murders at the time he wrote the lyrics. The State responds that the line relates to the Walnut Street murders because the investigation of those murders took a long time. Because Mr. Quintero's contention is sufficiently plausible, we conclude there is not a strong nexus between this lyric and the crimes charged.

The next line, "SHOUT OUT TO THE HOMIES DOING TIME IN [CLALLAM] BAY," also provides no factual nexus to the murders for which Mr. Quintero was

charged. Mr. Quintero wrote his lyrics in October 2015. Charges for the Walnut Street murders were not filed until April 2016. For this reason, no one would be doing time in October 2015 for those murders. The State contends this line was a reference to Mr. Lozano because he went to prison shortly after the Walnut Street murders based on his conviction stemming from the controlled buy with Ms. Rojas. Even if the line does refer to Mr. Lozano, it has no factual nexus to the Walnut Street murders.

The third line admitted was "AND ONE EIGHT SEVEN GREEN LIGHT TO ALL THEM KNOWN RATAS." Mr. Quintero argues this line should be read in context with the lines before it. Those lines include: "MURDER IN THE FIRST DEGREE IS WHAT THE PAPERS SAID" and "ANOTHER 4 HOMIES ON THE LOCKDOWNS WHAT I READ." CP at 62. Mr. Quintero asserts there was no evidence presented that information about the Walnut Street murders was in the newspapers at the time he wrote the lyrics. However, there was a newspaper article on the *Green Lantern* murder published in the Tri-City Herald on October 25, 2015. That newspaper article reflects that Mr. Carmona Hernandez and his three accomplices were arrested for the Green Lantern incident. Mr. Quintero contends the redacted lines refer to the Green Lantern incident and the "GREEN LIGHT" line does also because the victim in that case was a snitch/rata who had testified against a fellow gang member. The State contends the

49

"GREEN LIGHT" line refers to Ms. Rojas being a snitch.  Because Mr. Quintero's contention is very plausible, we conclude there is not a strong nexus between that lyric and the Walnut Street murders.

The next lines, "THEY HIT EM WITH THE 500,000 ON THE BAIL[;] SO AINT NO [ONE] OUT OF JAIL YET THE HOMIES KEEP IT QUIET," Mr. Quintero contends these lines further reinforce the argument that the lyrics are about the Green Lantern incident.  He contends this is so because Mr. Carmona Hernandez was held on $500,000 bail for his involvement in the Green Lantern incident.  At the time he wrote the lyrics, Mr. Quintero had not been charged with the Walnut Street murders and was being held on $100,000 bail.  We conclude that these lines do not provide any factual nexus to the Walnut Street murders.

Portions of "AINT NO PEACE TREATY" were also admitted at trial.  That rap had 48 lines and the jury saw 6 of them.  Mr. Quintero argues the rap in its unredacted form is filled with generalized braggadocio about gang life.  He contends there is a reference to a "rat" but it is mere speculation to assume the lyric is about Ms. Rojas.  He provides numerous persuasive authorities discussing how references to "snitches" is widespread in rap music and has become a central theme.  *See* Michael A. Gregory, *Montague v. State: From Bars to Bars—A Riff for Narrow Interpretation of Hip-Hop*

*Lyrics in Criminal Prosecutions*, 81 MD. L. R. ONLINE 107, 130 (2022); Michael

Gregory, *Murder was the Case That They Gave Me: Defendant's Rap Lyrics As Evidence

in a Criminal Trial*, 25 B.U. PUB. INT. L.J. 329, 355 (2016).

Regarding the line "THE MUZZLE KEEPS FLASHIN IT KEEPS THE BODY

SHAKING," Mr. Quintero argues it is ambiguous. He contends the line could be talking

about the victim being shot four times during the Green Lantern incident. And, although

Mr. Carmona Hernandez testified that Mr. Quintero told him that he could see Ms.

Rojas's body moving while the bullets hit her, the lyrics also talk about shooting a person

in the head and Ms. Rojas was not shot in the head. Outside of the mention of a "rat" and

the reference to "the body shaking," which both are ambiguous at best and cannot be said

to have "a strong nexus" to the Walnut Street murders, the remaining lyrics are

generalized lyrics of violence and have no factual nexus to the crimes.

Because neither rap lyric has a strong factual nexus to the Walnut Street murders,

their prejudicial effect substantially outweighed their probative value. The trial court did

not engage in a weighing process similar to the one outlined in *Skinner*. The admitted

lyrics posed a significant risk that the jury would use them to conclude Mr. Quintero was

a violent person who had a violent character and criminal propensity. As such, Mr.

Quintero's jury may have arrived at its decision to convict him by relying on the

impermissible character evidence found in the lyrics. We conclude that the lyrics should have been excluded under ER 403.[5]

> 2. *Repeatedly telling the jury that Jose Lozano did not have a valid Fifth Amendment right*

Mr. Quintero contends the trial court erred when it repeatedly told the jury that Jose Lozano did not have a valid Fifth Amendment right. Mr. Quintero claims this error was highly prejudicial because it allowed the State to argue that Jose Lozano was protecting Mr. Quintero. The State responds that the trial court properly concluded that Jose Lozano did not have a valid Fifth Amendment right, and its argument to the jury was proper under established principles. We agree with Mr. Quintero.

This court reviews a trial court's decision on a claim of privilege for abuse of discretion. *Ruiz*, 176 Wn. App. at 636. However, whether a privilege is available is a question of law this court reviews de novo. *State v. Meza*, 22 Wn. App. 2d 514, 525, 512 P.3d 608, *review denied*, 200 Wn.2d 1021, 520 P.3d 978 (2022).

---

[5] In its briefing to our court, the State objected to Mr. Quintero relying on ER 404(b) to exclude the rap lyrics. It argues he waived the argument because he failed to cite ER 404(b) to the trial court. We view ER 404(b) as irrelevant here. The trial court did not admit the lyrics to show Mr. Quintero's character. Rather, it admitted the lyrics because they contained veiled admissions by Mr. Quintero that he committed the Walnut Street murders.

No. 38585-0-III
*In re Pers. Restraint of Quintero*

*Fifth Amendment privilege*

Washington courts recognize an obligation of a witness to testify. *Ruiz*, 176 Wn.

App. at 635. The primary exception to that obligation is the Fifth Amendment privilege

against compulsory self-incrimination. *Id.* When properly invoked, the privilege extends

to any question for which the witness "has 'reasonable cause to apprehend danger from a

direct answer.'" *State v. Levy*, 156 Wn.2d 709, 731-32, 132 P.3d 1076 (2006) (internal

quotation marks omitted) (quoting *Hoffman v. United States*, 341 U.S. 479, 486, 71 S. Ct.

814, 95 L. Ed. 1118 (1951)).

Generally, "[w]hen a person has been convicted of a crime and there is no longer

any possibility of appeal, the Fifth Amendment privilege no longer exists because there is

no potential jeopardy for testifying." *Ruiz*, 176 Wn. App. at 636. In *Ruiz*, five men were

murdered by two gunmen. *Id.* at 627. Prior to Ruiz's trial, his codefendant had pleaded

guilty and testified under oath at the plea hearing, explaining that he and Ruiz had

committed the murders. *Id.* At Ruiz's trial, the defense sought to prevent the State from

calling the codefendant, arguing that he would assert his Fifth Amendment privilege.

*Id.* at 630. The trial court denied Ruiz's motion, and the prosecution called the

codefendant to testify. *Id.* The prosecutor asked the codefendant nearly 30 questions, all

of which the codefendant answered, "'I plead the Fifth.'" *Id.* at 631-33. After each

question, the trial court ordered the codefendant to answer the question, and the codefendant refused. *Id.* at 631. The jury convicted Ruiz, and he appealed to this court. *Id.* at 633.

On appeal, Ruiz argued it was error for the court to call the codefendant and the prosecutor to question him in light of his refusal to answer. *Id.* at 633-34. The parties conceded that the codefendant did not have a valid Fifth Amendment protection because he did not appeal his sentence following his guilty plea. *See id.* at 636. Ultimately, this court held no valid privilege existed, and the trial court did not err in denying the defense's motion to exclude the codefendant's testimony. *Id.* at 639-40.

However, the general rule set out in *Ruiz* does not contemplate a state's witness being put in jeopardy of federal prosecution. "[T]he constitutional privilege against self-incrimination protects a state witness against incrimination under federal as well as state law and a federal witness against incrimination under state as well as federal law." *Murphy v. Waterfront Comm'n of New York Harbor*, 378 U.S. 52, 77-78, 84 S. Ct. 1594, 12 L. Ed. 2d 678 (1964), *abrogated on other grounds by United States v. Balsys*, 524 U.S. 666, 118 S. Ct. 2218, 141 L. Ed. 2d 575 (1998) (holding that concern with foreign international prosecution was beyond the scope of the Fifth Amendment privilege against self-incrimination). In other words, "a state witness may not be compelled to give

testimony which may be incriminating under federal law" unless the federal government is prohibited from making use of the compelled testimony and its fruits. *Murphy*, 378 U.S. at 79.

Mr. Quintero cites *In re Contempt of Ecklund*, 636 N.W.2d 585 (Minn. Ct. App. 2001) to support his argument. In *Ecklund*, the State had charged the appellant with three criminal counts, including second degree murder. *Id.* at 587. The appellant pleaded guilty to second degree murder and all other charges were dismissed. *Id.* The appellant was called to testify at a codefendant's trial, but she asserted her Fifth Amendment privilege against self-incrimination and refused to testify. *Id.* The trial court found the appellant in contempt for refusing to testify. *Id.* She appealed the contempt order. *See id.*

On appeal, the State argued the appellant had waived her Fifth Amendment privilege by entering a guilty plea. *Id.* at 589. The Minnesota Court of Appeals disagreed, reasoning that the appellant had a legitimate concern about the possibility of a federal indictment. *Id.* Citing *Murphy*, the court stated, "[t]he Fifth Amendment privilege applies to a witness in a state prosecution who can show that her testimony could be used against her in a federal prosecution." *Id.* The court concluded that the trial

55

court had erred by finding the appellant had waived her Fifth Amendment rights and overturned the contempt order. *Id.* at 589-90.

There appears to be no published Washington cases on point. However, Division Two of this court has examined a similar issue in two unpublished opinions. *See State v. Jones*, No. 47121-3-II (Wash. Ct. App. Feb. 2, 2017) (unpublished) https://www. courts.wa.gov/opinions/pdf/D2%2047121-3-II%20Unpublished%20Opinion.pdf; *State v. Scanlan*, noted at 153 Wn. App. 1039, 2009 WL 5070420 at *3-4. Both opinions are consistent with *Murphy* and *Ecklund*.

Here, Jose Lozano asserted his Fifth Amendment privilege and refused to testify. Citing *Ruiz*, the trial court ruled that Jose Lozano had a duty to testify and that the Fifth Amendment did not apply to the questions asked of him. As previously mentioned, Jose Lozano pleaded guilty to two counts of first degree rendering criminal assistance for his participation in the murders. Under ordinary circumstances, Jose Lozano's right to invoke the privilege would no longer exist following his state conviction, but Jose Lozano was concerned about his testimony putting him in jeopardy of federal criminal liability.

The evidence against Jose Lozano in the Walnut Street shooting was as follows. Jose Lozano drove Mr. Quintero and Mr. Lozano to Walnut Street the night of the murders. Jose Lozano admitted to being involved. The silver van used in the shootings

generally matched the one owned by Jose Lozano's parents. Jose Lozano returned to the party stating, "'We just smoked the snitch.'" RP at 30.

During the offer of proof, Jose Lozano's counsel explained to the trial court that he had advised his client to invoke his Fifth Amendment privilege. Counsel argued that the vehicle Jose Lozano used to participate in the murders could possibly be connected with larger, federal RICO conspiracy charges. The prosecutor countered that he did not believe federal authorities would be interested in Jose Lozano unless firearms were involved, and he had no intention of asking Jose Lozano any questions about firearms. Jose Lozano's counsel reiterated it was his job to protect his client from liability no matter how minute the possibility of that liability may be. And it was not unreasonable for Jose Lozano's counsel to be concerned about federal RICO liability given Jose Lozano's membership in the 18th Street Gang.

RICO is codified in 18 U.S.C. §§ 1961-1968. It is a violation of RICO for "any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity" or to conspire to do so. 18 U.S.C. § 1962(c), (d). Under 18 U.S.C. § 1959(a)(5), attempting or conspiring to commit murder in aid of

racketeering is punishable by imprisonment of up to 10 years.[6]  And lastly, under

18 U.S.C. § 924(c)(1)(A)(i), a person who possesses a firearm in relation to any crime of

violence shall be sentenced to a term of imprisonment of not less than five years.  Federal

circuit courts have held criminal street gangs can be enterprises under RICO.  *United*

*States v. Ramirez-Rivera*, 800 F.3d 1, 19 (1st Cir. 2015); *United States v. Kamahele*, 748

F.3d 984, 1003-05 (10th Cir. 2014).  And the United States District Attorney has secured

convictions after prosecuting gang members for conspiring to violate RICO.  *See, e.g.*,

*United States v. Garcia*, 793 F.3d 1194, 1199 (10th Cir. 2015); *United States v. Nieto*,

721 F.3d 357 (5th Cir. 2013); *United States v. Harris*, 695 F.3d 1125, 1136 (10th Cir.

2012).

Regardless of whether federal agents were planning to pursue charges against Jose

Lozano, he had reasonable cause to believe he was in danger of being prosecuted.  His

own lawyer told the trial court as much.  Thus, the trial court abused its discretion when it

concluded that Jose Lozano lacked a valid Fifth Amendment right to refuse to testify.

The trial court's error was compounded when it forced Jose Lozano to invoke his

Fifth Amendment right in front of the jury.  In *Ruiz*, we explained:

---

[6] 18 U.S.C. § 1959 has been held to be unconstitutional as applied to juveniles.
*See United States v. Under Seal*, 819 F.3d 715 (4th Cir. 2016).

> Washington has long rejected the practice of forcing a witness to invoke a privilege, whether constitutional or statutory, in front of the jury. The basis for that "is that the State cannot and will not be permitted to put forward an inference of guilt, which necessarily flows from an imputation that the accused has suppressed or is withholding evidence, when by statute or constitution he simply is not compelled to produce the evidence." The government may not change the shield of protective privilege into an evidentiary sword.

*Ruiz*, 176 Wn. App. at 637-38 (citations omitted).

The error was further compounded because it allowed the State to argue to the jury that Jose Lozano's refusal to testify benefited only one person, Mr. Quintero, and his assertion of the privilege meant Mr. Quintero was one of the shooters.

> *3.     Nature of errors*

Mr. Quintero fails to argue how these evidentiary errors violated his constitutional due process rights. "'[N]aked castings into the constitutional sea are not sufficient to command judicial consideration and discussion.'" *In re Rosier*, 105 Wn.2d 606, 616, 717 P.2d 1353 (1986) (quoting *United States v. Phillips*, 433 F.2d 1364, 1366 (8th Cir. 1970)). For this reason, we treat these evidentiary errors as nonconstitutional.

FIFTH GROUND: MITIGATING FACTORS OF YOUTH

Mr. Quintero argues his right against cruel and unusual punishment was violated when the trial court failed to consider mitigating factors of youth and imposed a de facto life sentence. He contends he is entitled to resentencing under *Miller v. Alabama*,

567 U.S. 460, 489, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012) (holding mandatory life without parole sentences for *juveniles* violates the Eighth Amendment). He also cites *State v. Haag*, 198 Wn.2d 309, 329, 495 P.3d 241 (2021) (holding a de facto life sentence for a *juvenile* was unconstitutional where the resentencing court found the defendant was "'not irretrievably depraved nor irreparably corrupt'"); *In re Pers. Restraint of Monschke*, 197 Wn.2d 305, 329, 482 P.3d 276 (2021) (plurality opinion where the court considered whether the sentencing statute for aggravated first degree murder was unconstitutional as applied to 19- and 20-year-olds); and *State v. Houston-Sconiers*, 188 Wn.2d 1, 34, 391 P.3d 409 (2017) (holding when sentencing *juveniles* as adults, a trial court has full discretion to consider the defendant's youth and depart from the sentencing guidelines).

Recent decisions out of the Washington Supreme Court foreclose Mr. Quintero's argument. The court has never held "that 21-year-olds are equivalent to juveniles for *Miller* sentencing protections." *In re Pers. Restraint of Davis*, 200 Wn.2d 75, 87, 514 P.3d 653 (2022). In *Davis*, the court rejected arguments similar to Mr. Quintero's.

Just like Mr. Quintero, the petitioner in *Davis* was 21 years old when he committed his crime and was later convicted of first degree murder. *Id.* at 77. The trial court sentenced the petitioner to 767 months in prison. *Id.* at 79. In an untimely PRP, the

petitioner argued he received a de facto life sentence that was unconstitutional under

*Haag*. *Id.* at 86-87. The petitioner contended *Haag* required a sentencing court to

consider mitigating evidence of youth and the analysis should be applied to late-aged

adolescents. *Id.* However, the court concluded that no such finding was required because

21 year olds are not equivalent to juveniles for *Miller* sentencing protections. *Id.* at 87.

Ultimately, the *Davis* court concluded the petitioner failed to show actual and substantial

prejudice and affirmed Division One's dismissal of the petition. *Id.* at 80, 89-90.

Here, the trial court sentenced Mr. Quintero to 780 months in prison. During its

oral ruling, the court stated: "I did take into consideration the defendant's life situation,

age, maturity level, those sorts of things. Frankly, under the circumstances, it didn't

count for a whole lot." RP at 1474. Although the trial court, perhaps nominally,

considered Mr. Quintero's youth at sentencing, it was not required to do so. For this

reason, Mr. Quintero is unable to show the trial court erred and he is not entitled to relief

on this claim.

GROUND ASSERTED IN CONCLUSION: INEFFECTIVE ASSISTANCE OF APPELLATE
COUNSEL

In the conclusion of his timely PRP, Mr. Quintero argues his appellate counsel

performed deficiently by failing to raise the issues he now raises and, had they been

raised, the outcome of his appeal would have been different. We disagree.

To establish ineffective assistance of appellate counsel, a petitioner must establish that (1) counsel's performance was deficient and (2) counsel's deficient performance prejudiced the petitioner. *Smith v. Robbins*, 528 U.S. 259, 285, 120 S. Ct. 746, 145 L. Ed. 2d 756 (2000); *In re Pers. Restraint of Serano Salinas*, 189 Wn.2d 747, 759, 408 P.3d 344 (2018); *In re Pers. Restraint of Morris*, 176 Wn.2d 157, 166, 288 P.3d 1140 (2012); *In re Pers. Restraint of Orange*, 152 Wn.2d 795, 814, 100 P.3d 291 (2004).

Here, Mr. Quintero has demonstrated meritorious claims on two issues—the trial court abused its discretion by admitting his rap lyrics, and the trial court erred by concluding that Jose Lozano did not have a valid Fifth Amendment right to assert.

"Reviewing courts must be highly deferential to counsel's performance and 'should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *State v. Carson*, 184 Wn.2d 207, 216, 357 P.3d 1064 (2015) (quoting *Strickland v. Washington*, 466 U.S. 668, 690, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). "'When counsel's conduct can be characterized as legitimate trial strategy or tactics, performance is not deficient.'" *Id*. at 218 (quoting *State v. Kyllo*, 166 Wn.2d 856, 863, 215 P.3d 177 (2009)). This presumption can be overcome if the defendant can establish that "'there is no conceivable legitimate tactic explaining counsel's performance.'" *Id.* (internal

62

quotation marks omitted) (quoting *Grier*, 171 Wn.2d at 33). "We must resist the temptation to substitute our own personal judgment for [defendant's] attorney because 'it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.'" *Id.* at 220 (quoting *Strickland*, 466 U.S. at 689). Indeed, one reasonable trial strategy is to not make alternative arguments because it can be taken as a sign that the attorney believes his first argument is weak. *Id.* at 221. These standards apply to claims of ineffective assistance of trial counsel, and we see no reason why they should not apply equally to claims of ineffective assistance of appellate counsel.

In addition, a reasonable appellate strategy is to raise claims of error that are reviewed de novo, such as constitutional claims, while avoid raising claims of error that are reviewed for an abuse of discretion, such as evidentiary rulings. *See* WASH. STATE BAR ASS'N, WASHINGTON APPELLATE PRACTICE DESKBOOK, § 3.3 *Evaluate an Appeal in Light of the Appellate Process*, at 17-22 (4th ed. 2016).

Here, appellate counsel on direct review argued the trial court violated Mr. Quintero's constitutional right to a fair trial by excluding highly relevant evidence. That evidence was the State's agreement to assist two critical witnesses' U visa applications if they provided helpful information for prosecuting Mr. Quintero. This was a

constitutional claim, reviewed de novo, supported by appellate decisions in several states. Yet the argument did not prevail.

As noted above, we must resist the temptation of using hindsight to conclude that appellate counsel was deficient, either because the argument raised proved unsuccessful or because two successful arguments could have been raised. Those successful arguments related to an evidentiary error and a nonconstitutional error. It is a reasonable appellate strategy to raise claims of constitutional error and avoid raising claims of evidentiary error. Despite the benefit of hindsight, we conclude that appellate counsel was not deficient for failing to spot and raise the prevailing arguments. Because Mr. Quintero cannot establish deficient performance, we reject his claim of ineffective assistance of appellate counsel.

CUMULATIVE ERROR

In his second supplemental brief, filed after the statutory one-year bar, Mr. Quintero first argues the doctrine of cumulative error. He argues the errors related to admission of the rap lyrics and the trial court repeatedly telling the jury that Jose Lozano did not have a valid Fifth Amendment right, cumulatively created actual and substantial prejudice.

The State contends that Mr. Quintero's cumulative error argument is an untimely claim, resulting in his petition becoming "mixed," and subject to dismissal. We disagree.

"A petition which relies upon RCW 10.73.100 to overcome the one-year time bar in RCW 10.73.090 cannot be based upon any grounds other than the six grounds in RCW 10.73.100." *In re Pers. Restraint of Stenson*, 150 Wn.2d 207, 220, 76 P.3d 241 (2003). A petition that violates this rule is termed "mixed" and must be automatically dismissed. *Id.* Here, Mr. Quintero filed a timely petition. He is not relying upon RCW 10.73.100 to overcome the one-year time bar in RCW 10.73.090(1). Thus, the "mixed" petition rule does not apply.

We also disagree that a cumulative error argument is a new claim. Under the cumulative error doctrine, a petitioner may be entitled to a new trial when cumulative errors produce a trial that is fundamentally unfair. *In re Pers. Restraint of Lord*, 123 Wn.2d 296, 332, 868 P.2d 835 (1994). Understood in this manner, the doctrine merely provides a remedy for cumulative errors. If the claims of error upon which the cumulative error argument is based are timely raised, a remedy is not barred.

B.    PREJUDICE

As noted previously, a petitioner seeking postconviction relief must demonstrate he was actually and substantially prejudiced as a result of constitutional error or that the

trial suffered from a fundamental defect in nonconstitutional error that resulted in a complete miscarriage of justice. *Swagerty*, 186 Wn.2d at 807.

Outside of very general statements,[7] we find no Washington authority describing standards for determining when nonconstitutional errors, such as the two here, will result in a petitioner being granted collateral relief. We thus look to similar federal habeas corpus standards for guidance. *See In Pers. Restraint of Cook*, 114 Wn.2d 802, 812, 792 P.2d 506 (1990) (adopting the federal habeas corpus standard for nonconstitutional error review).

Generally, to succeed on a writ of habeas corpus, "a defendant must show a 'fundamental defect' in the proceedings which necessarily results in a complete miscarriage of justice or an egregious error violative of due process." *Gall v. United States*, 21 F.3d 107, 109 (6th Cir. 1994) (quoting *United States v. Ferguson*, 918 F.2d 627, 630 (6th Cir. 1990)). Nonconstitutional claims not raised at trial or on direct appeal are waived for collateral review except where the errors amount to something akin to a denial of due process. *Grant v. United States*, 72 F.3d 503, 506 (6th Cir. 1996).

---

[7] *See In re Pers. Restraint of Carrier*, 173 Wn.2d 791, 818, 272 P.3d 209 (2012); *In re Pers. Restraint of Goodwin*, 146 Wn.2d 861, 868, 50 P.3d 618 (2002).

A review of federal circuit authority provides a litany of standards from which to choose. One of the more helpful standards is set forth in *Wood v. Ercole*, 644 F.3d 83 (2nd Cir. 2011), and is summarized in the following extensive quote from *Corpus Juris Secundum*:

> The erroneous admission of prejudicial evidence will justify . . . relief only if such admission was a crucial, highly significant factor in the conviction. In assessing whether the erroneous admission of evidence had a substantial and injurious effect on a jury's decision, a . . . court considers the importance of the wrongly admitted evidence and the overall strength of the prosecution's case. The importance of wrongly admitted evidence is determined by the prosecutor's conduct with respect to the evidence, whether the evidence bore on an issue plainly critical to the jury's decision, and whether it was material to the establishment of a critical fact or whether it was instead corroborated and cumulative. The strength of the prosecution's case, absent erroneously admitted evidence, is probably the single most critical factor . . . .

39 C.J.S. *Habeas Corpus* § 156 (2023).

Here, the State's strongest evidence was the testimony of Mr. Quintero's two cellmates. They both testified that Mr. Quintero told them that he shot Ms. Rojas and Mr. Cano and told them why and how he committed the murders. In our review of the prosecutor's closing argument, he plainly emphasized the testimony from these two witnesses more than any other evidence. He additionally emphasized that both witnesses should be believed because their testimony came at a high cost—as "snitches" and they were at risk of being killed.

The prosecutor did discuss the rap lyrics written by Mr. Quintero and argued why they related to the Walnut Street murders. He also discussed Jose Lozano's refusal to testify and argued why the jury should infer Jose Lozano was protecting Mr. Quintero. Both of these arguments were secondary arguments, yet both were potentially prejudicial.

In our review of the strength of the State's case, we note that both cellmate witnesses had motivations to cooperate with the State. Both received promises from the State of assistance for U visa applications and one received a substantial reduction in charges and a favorable sentence for his testimony. But simply because both had these motivations to cooperate, does not mean they both lied.

As mentioned above, the clear emphasis of the prosecutor's closing arguments was the testimony of the two cellmates. Based upon our review of the evidence and how the prosecutor argued the case to the jury, we conclude that the prosecution's case was strong, even absent the erroneously admitted evidence. We conclude that the nonconstitutional errors were not a fundamental defect in the trial that resulted in a complete miscarriage of justice. Mr. Quintero's petition is denied.

_____
Lawrence-Berrey J.

I CONCUR:

_____
Cooney, J.

No. 38585-0-III

FEARING, C.J. (concurring) — I concur in the majority's opinion but write separately because I conclude the question of whether we should consider Jose Quintero's second supplemental brief is a closer call than suggested in the majority opinion. The question deserves fuller exploration. I also write separately to analyze Jose Quintero's argument that the trial court violated his due process rights when the court permitted introduction of rap lyrics as evidence and repeatedly held Jose Lozano in contempt for refusing to answer the prosecution's questions.

Second Supplemental Brief

RCW 10.73.090 imposes a one-year limitation period on the filing of a personal restraint petition. The one-year limitation period commences when the petitioner's judgment becomes "final." *In re Personal Restraint Petition of Skylstad*, 160 Wn.2d 944, 947, 162 P.3d 413 (2007).

The Rules of Appellate Procedure (RAPs) govern personal restraint petitions. *In re Personal Restraint Petition of Haghighi*, 178 Wn.2d 435, 446, 309 P.3d 459 (2013). The RAPs neither authorize nor prohibit amendments to personal restraint petitions. *Personal Restraint Petition of Haghighi*, 178 Wn.2d 435, 446 (2013). Washington courts, however, allow an amendment provided the amendment is timely asserted. *In re Personal Restraint Petition of Bonds*, 165 Wn.2d 135, 140, 196 P.3d 672 (2008). Washington law bars the amendment from relating back to the time of the filing of the

personal restraint petition for purposes of complying with the one-year time limit. *Personal Restraint Petition of Haghighi*, 178 Wn.2d 435, 446 (2013).

Jose Quintero's judgment of conviction became final on December 10, 2020. He filed a timely personal restraint petition on November 23, 2021. In this petition, Quintero, among other contentions, asserted, in a heading, that the admission of the rap lyrics and the repeated holding of Jose Lozano in contempt breached his right to a fair trial under both the state and United States Constitutions. But in the body of his brief, he cited only due process cases and law in support of this ground for granting the petition.

A petitioner must support his arguments with citation to legal authority. *In re Personal Restraint Petition of Waggy*, 111 Wn. App. 511, 518-19, 45 P.3d 1103 (2002). When the petitioner cites legal authority that discusses unrelated law, the petitioner does not support his petition with legal authority. Thus, this court correctly refuses to address Jose Quintero's argument that the trial court's ruling denied him a right to a fair trial. Conceivably, we could also refuse to address an argument based on the Due Process Clause because Quintero, in his heading, asserted only the right to a fair trial. But we would act overtechnically, if not absurdly.

Jose Quintero filed a supplemental brief in Spring 2023 that the Supreme Court would deem an amended petition. *In re Personal Restraint Petition of Benn*, 134 Wn.2d 868, 884 n.3, 952 P.2d 116 (1998). In this supplemental brief, Quintero asserts the Sixth Amendment rights to a fair trial and to confront witnesses and prosecutorial misconduct. We rule the amendment untimely.

2

In his quest for this court to review the merits of his second supplemental brief, Jose Quintero contends that a petitioner may, in later filings, support the same ground for relief in different arguments. He argues that his Sixth Amendment and prosecutorial misconduct assignments of error constitute the same ground for relief as his earlier due process ground. I disagree. He impliedly concedes that his prosecutorial misconduct contention is unrelated.

Jose Quintero cites *Personal Restraint Petition of Benn*, 134 Wn.2d 868 (1998), and *In re Personal Restraint Petition of Davis*, 152 Wn.2d 647, 101 P.3d 1 (2004), to support his contention that he does not assert a new ground in his second supplemental brief. If *Benn* and *Davis* addressed an amendment to a personal restraint petition, the two decisions would benefit Quintero. Nevertheless, in *Benn*, the Supreme Court determined whether the accused raised a new ground for relief in the personal restraint petition that he did not raise on appeal. In *Davis*, the court did not address either situation but rather cited general principles of law.

The law forbids the petitioner, in a personal restraint petition, from asserting the same grounds or issues asserted in an appeal. *Personal Restraint Petition of Davis*, 152 Wn.2d 647, 670 (2004). Thus, the opposite occurrence benefits the accused when he moves from an appeal to a personal restraint petition than when he travels between the personal restraint petition and an amendment to the petition. In the former, he suffers a disadvantage the more the two grounds are related and a benefit the more the two grounds differ. In the latter, the opposite is true.

3

In his earlier appeal, Gary Benn assigned error to the State's failure to timely supply evidence in violation of *Brady* rules and to the trial court's limitation of cross-examination of an important witness. *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). In his personal restraint petition, Benn argued that his trial attorney performed ineffectively when failing to earlier demand production of the State's evidence and failing to prevail in an argument to permit additional cross-examination. The court held that recasting an argument in that manner did not create a new ground for relief or constitute good cause for reconsidering the previously rejected claim.

Different policies impact the limitations on arguments raised in the initial personal restraint petition from limitations imposed on amendments to petitions. Limitations on the petition seek to promote finality of litigation, uphold the prominence of trial, and afford society the right to punish admitted offenders. *Personal Restraint Petition of Davis*, 152 Wn.2d 647, 670 (2004). Limits on the time for filing a personal restraint petition manage the flow of postconviction collateral relief petitions by requiring collateral attacks to be brought promptly. *Personal Restraint Petition of Bonds*, 165 Wn.2d 135, 141 (2008). Limitations on amendments to a petition encourage the petitioner to present to the court all new arguments since trial during the one-year limitation period.

Jose Quintero forwards no reason why we should apply the same rules when addressing an amendment to a personal restraint petition as we do when resolving the receptibility of the petition itself. Quintero also cites no decisions entailing what

4

constitutes a new ground for purposes of an amendment or any cases wherein a Washington court addressed whether an amendment to the petition related back in time to the petition.

Two Washington Court of Appeals decisions address the permissibility of a personal restraint petition amendment after the one-year time bar—*In re Personal Restraint Petition of Tricomo*, 13 Wn. App. 2d 223, 463 P.3d 760 (2020) and *In re Personal Restraint Petition of Wilson*, 169 Wn. App. 379, 279 P.3d 990 (2012). In *Wilson*, George Wilson's original petition alleged instructional error as the basis for granting him a new trial. The definition of "accomplice liability" departed from the statutory definition by using the phrase "a crime" when it should have said "the crime." Wilson's supplemental brief, written by an attorney, argued that trial counsel performed ineffectively when proposing the erroneous jury instruction. The State asked the court to decline addressing the ineffective assistance of counsel claim because the claim was new, and Wilson did not file the supplemental brief within one year of finality of the judgment.

This court, in *Wilson*, characterized the ineffective assistance argument as "part and parcel" of the instructional error contention. Under Washington precedent, when defense counsel proposed an erroneous instruction, the court generally denies review because of invited error. Nevertheless, if the instructional error resulted from ineffective assistance of counsel, the invited error doctrine does not preclude review. The court reasoned that seeing the accomplice liability instruction through the lens of ineffective assistance did not transform it into a different claim. The claim remained one of

5

instructional error. The court cited *In re Personal Restraint Petition of Davis* for the proposition that one does not assert a new claim by supporting a previous ground for relief with different factual allegations or with different legal arguments despite the principle applying to a new argument in the petition from the appeal.

*Personal Restraint Petition of Tricomo*, 13 Wn. App. 2d 223 (2020), has the opposite outcome. Lia Tricomo filed a timely pro se personal restraint petition, in which she argued double jeopardy, ineffective assistance of counsel and prosecutorial misconduct at the plea stage, and trial court error for failure to consider the effects of Paxil on her mental state in rendering its sentencing decision. In her supplemental petition, filed by counsel, Tricomo asserted the additional claim of ineffective assistance of counsel in failing to produce a qualified expert at sentencing to offer an opinion on the effects of Paxil. Because the supplemental petition was filed over one year after her judgment became final, this court rejected the supplemental argument.

Lia Tricomo requested this court entertain her additional argument of ineffective assistance of counsel as a constituent to her timely claim from her original petition and claim that the trial court refused to consider her proposed evidence about the effects of Paxil. She also contended that her newly raised ineffective assistance of counsel claim was ancillary to the timely claim made in her original petition that counsel was ineffective in negotiating her plea bargain. In disagreeing, this court distinguished *Wilson*. In *Wilson*, the petitioner lacked an avenue for redress of the instructional error without asserting ineffective assistance of counsel.

6

Jose Quintero's claim, that introduction of rap lyrics and repeatedly holding Jose Lozano in contempt violated his right to a fair trial and breached his right to confront witnesses, is not part and parcel of his earlier assertion that both occurrences breached his due process rights. Any violation of the Fifth Amendment due process confrontation clause does not depend on the breach of the Sixth Amendment fair trial right or its confrontation clause. Quintero does not characterize his second supplemental brief as being part and parcel of his original petition or his initial petition as being dependent on the untimely supplemental brief.

## Due Process

In his timely personal restraint petition, Jose Quintero argues, in ground four, that the trial court's evidentiary ruling on rap lyrics breached due process. This argument also extends to the court's ruling that demanded Jose Lozano testify and holding Lozano in contempt on his refusal to testify. The majority correctly rules that the trial court abused its discretion when admitting the rap lyrics and holding that Lozano lacked a Fifth Amendment right not to testify. The majority goes directly to assessing whether those two errors resulted in the nature of prejudice needed to gain relief for a nonconstitutional error, that being "'a fundamental defect which inherently results in a complete miscarriage of justice.'" *In re Personal Restraint Petition of Nichols*, 171 Wn.2d 370, 373, 256 P.3d 1131 (2011) (quoting *In re Personal Restraint Petition of Lord*, 152 Wn.2d 182, 188, 94 P.3d 952 (2004)).

7

If Jose Quintero showed a constitutional error, his burden in establishing prejudice lessens. He need not show a fundamental defect or complete miscarriage of justice. He instead must establish that the outcome likely would have differed had the alleged error not occurred. *In re Personal Restraint Petition of Davis*, 200 Wn.2d 75, 86, 514 P.3d 653 (2022). Thus, we should address whether the trial court's erroneous rulings breached due process.

Jose Quintero cites two United States Supreme Court decisions for the proposition that mistaken evidentiary rulings violate due process by depriving the defendant of a fundamentally fair trial. Quintero fashions the rule as if all erroneous evidentiary rulings violate the Due Process Clause. But, the two decisions, *Estelle v. McGuire*, 502 U.S. 62, 75, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991), and *Dowling v. United States*, 493 U.S. 342, 352, 110 S. Ct. 668, 107 L. Ed. 2d 708 (1990), do not support such a rule.

In *Estelle v. McGuire*, 502 U.S. 62 (1991), the Supreme Court denied Mark McGuire habeas corpus relief. In denying relief, the Court held that its habeas powers did not allow it to reverse a conviction based on a belief that the trial judge incorrectly interpreted the state evidence code. In *Dowling v. United States*, 493 U.S. 342 (1990), the Supreme Court denied the petitioner, Reuben Dowling, relief from a federal district court conviction. The district court may have erred when allowing introduction of evidence relating to a crime, for which a jury had previously acquitted Dowling, but the error did not violate due process.

To prevail on a claim that an evidentiary error deprived the petitioner of due process under the Fourteenth Amendment, a state court's evidentiary decision must have been so arbitrary or prejudicial that it rendered the trial fundamentally unfair. *Romano v. Oklahoma*, 512 U.S. 1, 12-13, 114 S. Ct. 2004, 129 L. Ed. 2d 1 (1994). Stated differently, the petitioner must show that the error was so pervasive as to have denied him a fundamentally fair trial. *Collins v. Scully*, 755 F.2d 16, 18 (2d Cir. 1985). The pertinent question is whether admission of evidence "so fatally infected the proceedings as to render them fundamentally unfair." *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991). A proceeding is fundamentally unfair only when the error had a substantial and injurious effect or influence in determining the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 623, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993).

The due process test bears resemblance to the prejudice a petitioner must show to be provided relief from restraint for nonconstitutional errors. For the same reasons that the majority concludes that Jose Quintero fails to make a sufficient showing of prejudice, I conclude he falls short in establishing a due process right. Therefore, the majority is correct to analyze prejudice, for purposes of Quintero's personal restraint petition, only under the nonconstitutional standard.

Fearing, C.J.

9